IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DARRELL MORTON, | CIVIL ACTION |
| Plaintiff, | |
| v. | No. 09-4877 |
| CITY OF PHILADELPHIA; WARDEN CLYDE D. GAINEY; AMERICA SERVICE GROUP, INC.; PRISON HEALTH SERVICES, INC.; A.R. CAULK, M.D.; MOHAMMED HAQUE, M.D.; ARNONE, M.D.; EKE KALU, M.D.; ARIA HEALTH; FRANKFORD HOSPITAL; MATTHEW MCLEAN, M.D.; MATTHEW YOUNG, D.O.; JOHN DOE, M.D. (I-III); and ABC CORP., | |
| Defendants. | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**  **FEBRUARY 15, 2011**

Presently before the Court is Defendants City of Philadelphia (the "City"), Warden Clyde D. Gainey ("Warden Gainey"), America Service Group Inc., Prison Health Services, Inc., ("PHS")[1], A.R. Caulk, M.D. ("Dr. Caulk"), Mohammed Haque, M.D. ("Dr. Haque"), James Arnone, M.D. ("Dr. Arnone"), and Eke Kalu, M.D.'s ("Dr. Kalu") Motion for Summary Judgment against Plaintiff Darrell Morton ("Morton"). Also before this Court is Defendants Frankford Hospital ("Frankford") and Aria Health's ("Aria")[2] Motion for Partial Summary

---

[1] America Service Group Inc. is PHS's parent corporation. We refer to them collectively as "PHS."

[2] Subsequent to the subject event, Frankford Hospital underwent a name change and is now know as Aria Health. We refer to them collectively as "Aria."

Judgment against Morton.  For the reasons set forth below, the Summary Judgment Motion will be granted in part and denied in part, and the Motion for Partial Summary Judgment will be granted.

I.  BACKGROUND

Morton filed the instant Complaint on October 22, 2009 alleging a violation of his civil rights pursuant to 42 U.S.C. § 1983, and medical malpractice related to medical care that he received in the Philadelphia Prison System beginning on July 1, 2008.  Morton, an inmate at a county correctional institution named Curran-Fromhold Correctional Facility ("CFCF"), contends that on July 1, 2009 he was caused to slip and fall on a slippery floor surface inside of this facility.  (Compl.¶ 19.)  Morton states that on July 2, 2008, he was transported to Frankford Hospital with complaints of pain in his thighs, legs, and an inability to walk.  (Id. ¶ 20.)  X-rays at Frankford revealed hip fractures, but the attending physician there determined that although there was "no need for emergent surgery, he should follow up at a university center for additional consultations and/or definitive treatment," and it was recommended that he get additional therapy to his hips, thighs and legs after he returned to CFCF.  (Id. ¶¶ 22-23.)  Morton asserts that at no time subsequent to his release from Frankford Hospital and return to CFCF was he ever transported to a university hospital for any type of consultation, nor did he receive any physical therapy from PHS.  (Id. ¶¶ 27-28.)  Morton also claims that he did not receive any diagnostic or radiology testing in the months of July and August 2008 (Id. ¶ 29.)  He avers further that on or around July 16, 2008, a prison health progress note indicated that Morton should have an orthopedic follow up as soon as possible, and that no such follow up was scheduled for the months of July, August, or September 2008.  (Id. ¶¶ 31-34.)  Morton states that from July 2, 2008

until September 10, 2008, he was continuously vocal about his hip pain and symptoms which were documented by the prison medical staff, but he received no medical relief or treatment from PHS. (Id. ¶ 38.) Morton avers that he finally had an orthopedic consultation with Dr. Dennis Mc Hugh, and that on October 27, 2008, he was admitted into Mercy Suburban Hospital where he underwent a hip procedure called a "bilateral bipolar hemi-arthroplastics" performed by Dr. McHugh. (Id. ¶¶ 39-40.) Morton asserts that all defendants were informed by Frankford Hospital that he had urgent medical needs and required treatment yet, in violation of his Eight Amendment constitutional rights, they repeatedly refused to treat him and send him to the recommended facilities for consultations, therapy, and diagnostic testing. (Id. ¶¶ 43-45.) Morton asserts that this delay in treatment caused permanent deformities and gait impairments, and that all defendants acted with deliberate indifference to his serious medical needs. (Id. ¶¶ 48-54.)

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable

3

jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

## III. DISCUSSION

### A. Deliberate Indifference

The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. Estelle v. Gamble, 429 U.S. 97 (1976). The Estelle Court determined that in order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. Id. at 106. Therefore, to succeed under these principles, Morton must demonstrate (1) that the defendants were deliberately indifferent to his medical needs and (2) that those needs were serious. See id.

It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute "deliberate indifference." As the Estelle Court noted: "[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" Id. at 105; see also Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999); Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993) ("[T]he law is clear that simple medical malpractice is insufficient to present a constitutional violation."). "Deliberate indifference," therefore, requires "obduracy and wantonness," Whitley v. Albers, 475 U.S. 312, 319 (1986), which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk. See Farmer v. Brennan, 511 U.S. 825, 842 (1994) (stating that "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm").

The Third Circuit has found "deliberate indifference" in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment. See Durmer, 991 F.2d at 68.

We first note that there is no issue in this case that Morton meets the "serious medical need" part of the Estelle standard. There is no dispute that Morton somehow injured his hips on July 1, 2008. He was carried by stretcher to the CFCF medical unit where he was twice prescribed pain medication and taken back to his cell. The following day, he was transported to Frankford Hospital where he was diagnosed with two broken hips that needed surgical repair. Ultimately, on October 27, 2008, four months after Morton's initial diagnosis, he underwent hip

replacement surgery. Thus, our focus is on the second part of the Estelle standard- whether the Defendant physicians were deliberately indifferent to his medical needs. 429 U.S. at 106.

Morton has brought a cause of action for "deliberate indifference" against CFCF physician, Dr. Haque, CFCF's Chronic Care Physician, Dr. Caulk, CFCF's Chief Medical Officer, Dr. Arnone, and CFCF's Medical Director, Dr. Kalu. As will be discussed, infra, we are of the opinion that sufficient evidence exists in the record that each of these physicians committed acts and/or failed to act to get Morton the orthopedic care that he needed which a reasonable jury could conclude amount to "deliberate indifference" to Morton's serious medical needs. The record contains evidence of a healthcare system at CFCF that neglected the needs of inmates that needed immediate orthopedic care and/or other immediate medical attention. The deposition testimony of the Defendant physicians describes a medical care environment of confusion and uncertainty regarding each physician's responsibilities to ensure that an inmate patient gets the medical that care he needs. As will be discussed below, this is evident by the finger pointing of these physicians as to who was ultimately responsible for the failure to get Morton the immediate orthopedic care for his hip fractures that they all agree that he needed. We discuss each physician in turn.[3]

**1. Dr. Haque**

Dr. Haque has been employed as a physician for PHS at the Philadelphia Prison System since 1997. (Haque Dep. at 11.) Dr. Haque testified at his deposition that after reviewing his medical progress notes he recalled seeing Morton on two occasions in July 2008. (Haque Dep. at

---

[3]Under this section, we also address Morton's "deliberate indifference" claim against Warden Gainey.

20.) The first time was on July 1, 2008 when Morton was brought to the medical unit with complaints that he could not walk. Morton indicated to him that he had gone to bed that morning and when he woke up that afternoon he could not walk. (Id. at 20-21.) Dr. Haque noted that Morton has some kind of muscular skeletal problem with one leg appearing shorter than the other, and that he thought Morton had pulled a muscle. (Id.) Dr. Haque stated that he first ordered medications at 8:00 p.m. consisting of Disalcid, a pain medication and Flexeril. (Id.) He indicated that an hour later when Morton continued to complain of pain, he ordered Vicodin, a stronger pain medication. No x-rays were taken, nor was Morton taken to an emergency room. Rather, Morton was then sent back to his cell. (Id. at 60-63.)

As noted, the next day on July 2, 2008, Morton was taken to Frankford Hospital where he was diagnosed with hip fractures called "bilateral femoral neck fractures." Id. at 65-66. Dr. Haque testified that he couldn't recall if it was a doctor or a nurse, but he received a phone call from somebody at Frankford Hospital telling him that Morton should be "seen at a University Hospital." (Id. at 35-36.) He stated further that he did not make any notations regarding this phone call, but he thinks he spoke about it to CFCF's Chronic Care Physician, Dr. Caulk. (Id. at 36.)[4] Dr. Haque testified that the second time he saw Morton was two days later on July 3, 2009. (Id. at 23.)

It is at this time when Morton sees Dr. Haque after returning from Frankford that we find that several of his actions concerning Morton's care could constitute "deliberate indifference." First, Dr. Haque acknowledged that he was aware that Morton had been diagnosed with "bilateral

---

[4] Such conversation was noted in Dr. Caulk's Progress Note dated July 7, 2008. (Defs.' Mot. Summ. J., Ex. F at 8-9.)

7

femoral neck fractures" and had a serious medical condition when he saw him on July 2, 2009, yet he did not examine Morton or review any x-rays from Frankford. (Id. at 65-67.)

Dr. Haque also acknowledged that he was aware of the discharge instructions from Frankford that indicated that Morton needed to be followed up "at a University Hospital." (Id. at 23.) In fact, Dr. Haque filled out a referral form so that Morton could be seen at a University Hospital, and he told Morton that he should follow up with the Chief Medical Officer, Dr. Arnone and the Chronic Care Doctor, Dr. Caulk, at CFCF for his fractures. (Id. at 23.) Moreover, Dr. Haque indicated in a Progress Note that Morton was in need of "urgent" care (Id. at 95.) Yet, despite his belief that Morton needed "urgent" care, needed surgery on his hips, and needed to be seen at a University Hospital, Dr. Haque never saw Morton again, never reviewed his chart, never followed up on the referrals he made relative to Morton, and never had any conversations about Morton with Drs. Arnone, Caulk or Kalu concerning Morton's care (Id. at 24-26, 42, 111.) In addition, Dr. Haque acknowledged that there was an issue at the prison in July 2008 concerning the failure of prisoners receiving orthopedic care that still persists to the present. (Id. at 42.) Dr. Haque, however, admitted that he never attempted to do anything about this problem and failed to discuss such with Drs. Arnone or Kalu. (Id. at 42-44.) Thus, we decline to grant summary judgment for Dr. Haque, and find that the question of whether Dr. Haque's actions or inaction amount to deliberate indifference should be left to a jury.

**2. Dr. Caulk**

Dr. Caulk is Board Certified in Family Practice, and worked for PHS from December 2002 to July 31, 2009. As noted, Dr. Caulk was the Chronic Care Physician at CFCF in July 2008 seeing patients such as Morton for his diabetes. (Caulk Dep. at 8-15.) Like Dr. Haque, Dr.

Caulk was well aware of the seriousness and immediacy of Morton's hip problem, but instead of making sure that Morton got the orthopedic care he needed, she failed to act and now places the responsibility on the other Defendant doctors for the breakdown in the system. According to Dr. Haque, Dr. Caulk was Morton's primary care physician at CFCF. (Haque Dep. at 112.) However, according to Dr. Caulk, Dr. Arnone was Morton's primary care physician. (Pl.'s Resp. Summ. J., Ex. Q at 26.) Dr. Caulk first saw Morton on July 7, 2008, four days after he had returned from Frankford Hospital. The Orthopedic Referral form filled out by Dr. Haque on July 3, 2009 was also signed by Dr. Caulk on July 7, 2009. Dr. Caulk wrote "Urgent" for the orthopedic referral to take place. Dr. Caulk also acknowledged that she was aware that Dr. Haque had also characterized Morton's condition as "Urgent."[5] (Caulk Dep. at 28-29.) In addition, Dr. Caulk faxed a cover sheet with the notation, "Urgent for Ortho," to Dr. Kalu on this same date. (Id. at 35.) Dr. Caulk stated that Dr. Kalu was the Medical Director and the person who acted on the referral forms. (Id. at 61.) Dr. Caulk testified further that she did not know what happened in response to the July 7, 2008 referral that she sent to Dr. Kalu and stated that "It looks like I did nothing, because I am not in charge of faxing." (Id. at 40.) She stated further that Dr. Arnone should have signed the fax and "he should have followed up on it" as the Chief

---

[5]Dr. Caulk acknowledged that she wrote in this report:

> This is a 27-year-old male walking without problems until 7/1/08. Questionable, doubtful pathological fractures. Patient CT, x-rays results from Frankford Hospital not received; requested today. Patient with obviously abnormal left hip and increased pain; unable to walk or transfer. That means to transfer from a seat - - one seat to another seat. Unsatisfactory treatment so far.

(Caulk Dep. at 35.)

9

Medical Officer at CFCF. (Id. at 40-41.) Furthermore, Morton missed a medical appointment on July 16, 2008 with Dr. Caulk because he was at a visit and could not go to the Medical Unit. (Pl.'s Resp. Mot. Summ. J., Ex. F at 10.) However, Dr. Caulk made an entry that day in her progress notes that Morton "should have ortho follow up ASAP."[6] (Caulk Dep. at 44.) She, however, did not make any referrals as she had done when she had seen Morton on July 7, 2008. In fact, she stated that "I am not really responsible for his ortho problems, unfortunately, or fortunately, whatever you say." (Id.) Again, Dr. Caulk stated that it was not her "role", "it's the chief medical officer's role." (Id.) Dr. Caulk stated that she could not imagine not talking to Dr. Arnone about Morton, but she did not write it in a progress note, and acknowledged not sending anything to Dr. Kalu that Morton should have an orthopedic follow-up as soon as possible. (Id. at 45.) In fact, Dr. Caulk never had any discussions with Dr. Arnone about Morton, and did nothing to alert Dr. Kalu who had yet to act on her July 3rd and July 7th referral requests. (Id.)

Dr. Caulk saw Morton again on August 4, 2008. Dr. Caulk's entry in her August 4, 2008 progress notes quotes Morton as saying, "I just have two broken hips that nobody's paying attention to." (Pl.'s Resp. Mot. Summ. J., Ex. J.) After seeing Morton on this date, Dr. Caulk did nothing to follow up with Dr. Kalu about Morton's medical needs. She never called Dr. Kalu or had any in-person discussions with him about Morton. (Caulk Dep. at 84.) When asked why, Dr. Caulk stated that "I have worked there for six years, and you don't call Dr. Kalu after you send a fax, because there is - - it takes time for every fax to go through, and they have a system, and once you submit the referral that is done. Your job is done. You have no power to do

---

[6]Dr. Caulk testified that she wrote "ASAP" because "I thought this patient needs to be seen, and if you're going to get a patient to be seen you need to indicate to Kalu that you really think he needs to be seen. (emphasis added) (Caulk Dep. at 68.)

anything else." (Id.) Dr. Caulk, however, did acknowledge that she had the authority to send Morton to an emergency room, but never did so. (Id.) We, thus, find that the issue of whether Dr. Caulk's actions amount to "deliberate indifference" to Morton's serious medical needs is one for a jury, and we deny her Motion for Summary Judgment.

### 3. Dr. Arnone

Dr. Arnone began working in the Philadelphia Prison System in 1989. He transferred from the House of Corrections to CFCF in January 2008, and served as the Chief Medical Officer at CFCF at the time of Morton's incarceration. (Arnone Dep. at 14-19.) Dr. Arnone testified that he had the authority to refer patients to an emergency room, "if it's a dire emergency." (Id. at 33.) He never referred Morton to an emergency room or submitted any referral forms for him. (Id. at 61.) Dr. Arnone also never followed up on any of the referral forms sent on behalf of Morton by either Dr. Haque or Dr. Caulk. (Id. at 43.) Again, like Drs. Haque and Caulk, Dr. Arnone refuses to accept any responsibility for the failure of Morton to get orthopedic care, and places the blame on the Defendant doctors. Dr. Caulk stated that he was not even aware of any of the orthopedic referrals concerning Morton, and that such referrals were not his responsibility. (Id. at 83-84.) According to Dr. Arnone, it is the responsibility of the physician who completes the form to follow up on the form, and that Dr. Caulk, as Morton's Chronic Care Physician, was responsible for following up on, monitoring, and tracking Morton's orthopedic care. (Id. at 84-85.).

It must also be noted that on July 9, 2008, without ever having seen or having examined Morton, Dr. Arnone issued an order changing Morton's medication. (Id. at 78.) Moreover, the first time he saw Morton was on July 31, 2008. Dr. Arnone did not conduct a medical

examination of Morton, but changed his medication from Tylenol #3 to Vicodin. (Id. at 56-58.) Dr. Arnone did not document anything to suggest that he knew or realized that Morton was awaiting an orthopedic examination. (Id. at 60.) A week later, Dr. Arnone again saw Morton for an unscheduled visit and only examined him for a blood sugar problem despite the fact that a progress note in Morton's chart from August 4, 2008 quoted Morton as complaining that "I have two broken hips that nobody is paying attention to." (Id. at 65.) Dr. Arnone testified that he did not recall ever seeing that progress note at the time he saw Morton on August 7, 2008. (Id.) For these reasons, we also decline to grant Dr. Arnone's request for summary judgment.

### 4. Dr. Kalu

Dr. Kalu is the PHS Regional Medical Director for the Philadelphia Prison System. Dr. Kalu testified at his deposition that he does not treat patients on a day-to-day basis, but that his duties are administrative. (Kalu Dep. at 16-24.) He testified that he approved the Orthopedic Referral form that had been faxed by Dr. Haque on July 3, 2008, and also faxed by Dr. Caulk on July 7, 2008. (Id. at 55-63.) Dr. Kalu acknowledged never having reviewed Morton's chart, progress notes, or physician's orders in July 2008. (Id. at 104-106.) However, unlike Drs. Haque, Caulk, and Arnone, Dr. Kalu accepted some responsibility for the failure of Morton not receiving immediate orthopedic care. In fact, when asked "Whose responsibility was it in July of 2008 to make sure that Darrell Morton got the ortho consult that he was waiting for," he responded that "It was our responsibility as PHS to make arrangements for the orthopedic consult visit." (Id. at 77.) Dr. Kalu refused to place the blame on any one of the Defendant physicians, but rather stated, "everyone played a role in the process, so we all had a responsibility to ensure that the patient got to the visit." (Id. at 78.) As noted earlier, both Drs. Caulk and Haque faxed

referrals for orthopedic care to Dr. Kalu, and according to Dr. Caulk, Dr. Kalu as medical director was the one who acted on the referrals. (Caulk Dep. at 61.) Thus, summary judgment is denied for Dr. Kalu as well.

**5. Warden Gainey**

Morton has also brought a cause of action for deliberate indifference against Warden Gainey. It must first be noted that Warden Gainey cannot be held liable under a theory of respondeat superior under Section 1983. See Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 691 (1978). In addition, Morton has not produced sufficient evidence that a reasonable jury could conclude that Warden Gainey was "deliberately indifferent" to his serious medical needs. Morton asserts that he spoke to Warden Gainey on one occasion in July 2008. Morton asserts that while Warden Gainey was taking a tour of the prison, he shook his hand and told him about his hips being broken and asked when he could see a doctor. Morton asserts that Warden Gainey took his inmate number, but never acted upon this request. (Pl.'s Resp. Mot. Summ. J., Ex. D at 8-10.) However, beyond this one encounter with Warden Gainey, Morton has not produced any other evidence regarding Warden Gainey exhibiting deliberate indifference to his serious medical needs.[7] We find this one instance insufficient to amount to deliberate indifference and, accordingly grant Summary Judgment for Warden Gainey on all counts brought against him.

---

[7]Nor does Morton argue in his Response to this Motion that this act of Warden Gainey alone is enough to amount to "deliberate indifference."

B.   **Policy or Custom**

   1.  **PHS**

PHS asserts that it is entitled to summary judgment because a private company performing a municipal function may not be held vicariously liable under § 1983.  It is well-settled that PHS cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.  See Monell, 436 U.S. at 691.  However, PHS can be liable to Morton if Morton can provide evidence that there was a relevant PHS policy or custom, and that the policy caused the constitutional violation he alleges.  See Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1997); Natale v. Camden County Correctional Facility, 318 F.3d 575, 583-84 (3d Cir. 2003).

Not all state action rises to the level of a custom or policy.  A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict."  Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)).  A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law."  Bryan County, 520 U.S. at 404.

In Natale v. Camden County Correctional Facility, the United States Court of Appeals for the Third Circuit identified three situations where acts of a government employee or other state actor may be deemed to be the result of a policy or custom of the entity for which the employee works, thereby rendering the entity liable under 42 U.S.C. § 1983.  318 F.3d at 584.  First, liability will extend to the entity when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act is an implementation of that policy.  Id.

14

Second, liability extends when no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.  Id.  Third, liability will extend when the policymaker has failed to act affirmatively at all, and the need to take some action to control the agents of the government was so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.  Id.

Here, based on the above testimony of the Defendant doctors, a reasonable jury could conclude that the failure to establish a policy to address the immediate medical needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs.  A reasonable jury could infer that a system responsible for failure to take care of the orthopedic medical needs of its inmates is the product here of PHS's action or acquiescence.  See Berg, 219 F.3d at 275 (holding that a reasonable jury could infer from testimony of police officer about system for issuing warrants that system was the product of a decisionmaker).  A jury could also infer that the failure to establish a more responsive policy caused the specific constitutional violation of which Morton complains.

Morton has presented evidence here that PHS had policies in place at CFCF discouraging physicians from sending patients to the emergency room and discouraging physicians from calling the Medical Director to follow up on referral requests.  Moreover, there is evidence of record for a reasonable jury to conclude that it became a custom at PHS that it had no procedures in place for the treatment and follow up of an inmate's orthopedic needs, ensuring consistent and adequate methods of communication among the physicians in securing that treatment, making

certain that inmates' medical needs were followed by the medical staff, and making certain that physicians orders were addressed. Accordingly, we deny PHS's request for summary judgment.

### 2. City of Philadelphia

The City also cannot be held liable under a theory of respondeat superior under Section 1983. See Monell, 436 U.S. at 691. To prevail against the City under Section 1983, Morton must prove that his Constitutional rights were violated as the result of a municipal policy or custom of deliberate indifference to the rights of its citizens. Id. at 694; see also City of Philadelphia , 947 F.2d 1042, 1064 (3d Cir. 1991). To establish municipal liability under Monell, "a plaintiff must identify the challenged policy, attribute it to the city itself, and show a casual link between the execution of the policy and the injury suffered." Losch v. Borough of Parksburg, 736 F.2d 903, 910 (3d Cir. 1984).

Here, while Morton has produced evidence that PHS had policies or lack of policies at CFCF regarding the immediate health care needs of its inmates, Morton has not produced any evidence that the delays in his getting orthopedic care for his hip fractures was the result of a policy, custom, or practice of the City. Because the record is devoid of any evidence that the City had such a policy or practice at CFCF or in its prison system, we grant summary judgment for the City.

### C.     Medical Malpractice

Morton has also brought causes of action for medical malpractice against Drs. Haque, Caulk, Arnone, and Kalu. Drs. Haque, Caulk, and Arnone submit that each are entitled to summary judgment because each provided appropriate medical care to Morton at the time they

16

had their medical encounters with him.  Dr. Kalu asserts that he is entitled to summary judgement because he is an administrator and did not provide medical care directly to Morton, but rather, only approved the orthopedic consultation, and subsequent hip surgery.  We disagree.

Under Pennsylvania law, to state a prima facie cause of action for a medical malpractice claim, a plaintiff must establish a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered and the damages suffered were a direct result of the harm.  Hightower-Warren v. Silk, 698 A.2d 52, 54 (Pa.1997). In order to establish medical malpractice under Pennsylvania law, a plaintiff must present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from accepted medical standards, and that such deviation was the proximate cause of the harm suffered.[8]  Mitzelfelt v. Kamrin, 584 A.2d 888, 891 (Pa. 1990).  The only instance in which expert testimony is not required is when the matter is so simple or the lack of care so obvious as to be within the range of experience and comprehension of non-professional persons.  Hightower-Warren, 698 A.2d at 54 n. 1; see also Hakeem v. Salaam, 260 Fed. Appx. 432, 434 (3d Cir. 2008)

Here, for the reasons discussed, supra, in denying each of these individual physicians summary judgment on Morton's deliberate indifference claims against them, we also deny summary judgment to them on the medical malpractice causes of action.  We conclude that a reasonable jury could find that their actions or lack thereof amount to medical malpractice.

---

[8] Morton has produced an expert report from Lawrence Mendel, M.D.  (Pl.'s Resp. Mot. Summ. J., Ex. K.)

D.	**Frankford[9] and Aria's Motion for Partial Summary Judgment**

Aria has filed a Motion for Partial Summary Judgment asserting that they are entitled to summary judgment on all claims against it except for the claim of vicarious liability for the acts and/or omissions of Defendant, Matthew McLean, M.D.[10] Morton has not opposed this Motion. Accordingly, we grant the Motion.

An appropriate Order follows.

---

[9]As noted, supra, Frankford Hospital is now known as Aria Health, and we refer to them collectively as "Aria."

[10]Dr. McLean, an orthopedic surgeon, directly evaluated Morton at the time he was brought to Frankford Hospital On July 2, 2009. He made treatment decisions concerning Morton's need for further care.

18