IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARRELL MORTON, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 09-4877 |
| CITY OF PHILADELPHIA; WARDEN CLYDE D. GAINEY; AMERICA SERVICE GROUP, INC.; PRISON HEALTH SERVICES, INC.; A.R. CAULK, M.D.; MOHAMMED HAQUE, M.D.; ARNONE, M.D.; EKE KALU, M.D.; ARIA HEALTH; FRANKFORD HOSPITAL; MATTHEW MCLEAN, M.D.; MATTHEW YOUNG, D.O.; JOHN DOE, M.D. (I-III); and ABC CORP., | : | |
| Defendants. | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**  JUNE 24, 2011

Presently before the Court is Defendants, Matthew McLean, M.D. ("Dr. McLean"), and Muscle Bone & Joint Center, P.C.'s ("MBJC")[1] Motion for Summary Judgment against Plaintiff Darrell Morton ("Morton").[2] For the reasons set forth below, the Summary Judgment Motion will be denied.

---

[1] Dr. McLean was employed by MBJC.

[2] As noted in our previous Memorandum and Order dated February 15, 2010, subsequent to the subject event, Frankford Hospital underwent a name change and is now know as Aria Health ("Aria"). See Morton v. City of Philadelphia, No. 09-4877, 2011 WL 536540, * 1 (E.D. Pa., Feb. 15, 2011). Aria has filed a Motion for Joinder seeking to join in the current Motion for Summary Judgment. As noted, we previously dismissed all claims against Aria except for claims of vicarious liability for acts or omissions of Dr. McLean. Id. at 18. The Motion for Joinder will be granted, but as will be discussed, the Motion for Summary Judgment will be denied.

## I. BACKGROUND

Morton filed the instant Complaint on October 22, 2009 alleging a violation of his civil rights pursuant to 42 U.S.C. § 1983, and medical malpractice related to medical care that he received at Frankford Hospital and the Philadelphia Prison System beginning on July 1, 2008. Morton, an inmate at a county correctional institution named Curran-Fromhold Correctional Facility ("CFCF"), contends that on July 1, 2009 he was caused to slip and fall on a slippery floor surface inside of this facility. (Compl.¶ 19.) Morton states that on July 2, 2008, he was transported to Frankford Hospital with complaints of pain in his thighs and legs, and an inability to walk. (Id. ¶ 20.) Upon admission to Frankford, Morton was seen by Dr. Matthew Young.[3] X-rays were taken which revealed bilateral hip fractures. (Pl.'s Resp. Mot. Summ. J., Ex. I.) An MRI was also performed which confirmed the fractures. Morton was next seen by Dr. McLean. Dr. McLean asserts that based on the MRI results and Morton's clinical history he determined that emergency surgery was not necessary. Dr. McLean also asserts that it was his understanding from Morton's history that Morton had been walking on the fractures for months, and that his recent complaints of pain were due to muscle weakness, and not the fractures. (Def.'s Mot. Summ. J. at 4.) Dr. McLean concluded that "based upon Morton's youth, as well as the complexity of his medical condition," Morton would best benefit from a total hip replacement which was a procedure that he did not perform. He, therefore, discharged Morton back to the prison with instructions to "follow up with a University Center for definitive treatment." (Id.) Morton contends that at no time subsequent to his release from Frankford Hospital and return to CFCF was he ever transported to a university hospital for any type of consultation, nor did he

---

[3]On October 2, 2010, the parties stipulated to dismiss Dr. Young from this action.

receive any physical therapy from Prison Health Services, Inc. ("PHS"). (Compl. ¶¶ 27-28.) Morton also claims that he did not receive any diagnostic or radiology testing in the months of July and August 2008 (Id. ¶ 29.) He further avers that on or around July 16, 2008, a prison health progress note indicated that Morton should have an orthopedic follow up as soon as possible, and that no such follow up was scheduled for the months of July, August, or September 2008. (Id. ¶¶ 31-34.) Morton states that from July 2, 2008 until September 10, 2008, he was continuously vocal about his hip pain and symptoms which were documented by the prison medical staff, but he received no medical relief or treatment from PHS. (Id. ¶ 38.) Morton avers that he finally had an orthopedic consultation with Dr. Dennis McHugh, and that on October 27, 2008, he was admitted into Mercy Suburban Hospital where he underwent a hip procedure called a "bilateral bipolar hemi-arthroplastics" performed by Dr. McHugh. (Id. ¶¶ 39-40.) Morton asserts that all Defendants were informed by Frankford Hospital that he had urgent medical needs and required treatment yet, in violation of his Eighth Amendment constitutional rights, they repeatedly refused to treat him and send him to the recommended facilities for consultations, therapy, and diagnostic testing. (Id. ¶¶ 43-45.) Morton asserts that this delay in treatment caused permanent deformities and gait impairments, and that all Defendants acted with deliberate indifference to his serious medical needs. (Id. ¶¶ 48-54.)

On December 30, 2010, Defendants, City of Philadelphia (the "City"), Warden Clyde Gainey ("Warden Gainey"), America Service Group, Inc. ("America"), PHS, A.R. Caulk, M.D. ("Dr. Caulk'), Mohammed Haque, M.D. ("Dr. Haque"), James Arnone, M.D. ("Dr. Arnone"), and Eke Kalu, M.D. ("Dr. Kalu"), filed a Motion for Summary Judgment. Defendant Frankford Hospital also filed a Motion for Summary Judgment on this date. On February 15, 2011, this

Court filed a Memorandum and Order denying the Motion in part and granting it in part. See Morton, 2011 WL 536540 at * 1. Specifically, the Motion was denied with respect to America, PHS, Dr. Caulk, Dr. Haque, Dr. Arnone, and Dr. Kalu.[4] The Motion was granted with respect to the City and Warden Gainey. (Id.) In addition, Frankford and Aria's Motion for Partial Summary Judgment was granted. Dr. McLean filed the instant Motion for Summary Judgment on May 24, 2010, and on May 31, 2011, Aria and Frankford filed a Motion to join in this Motion.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of

---

[4]We determined that "The record contains evidence of a healthcare system at CFCF that neglected the needs of inmates that needed immediate orthopedic care and/or other immediate medical attention. The deposition testimony of the Defendant physicians describes a medical care environment of confusion and uncertainty regarding each physician's responsibilities to ensure that an inmate patient gets the medical that care he needs." Morton, 2011 WL 536540 at *6.

Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

## III. DISCUSSION

### A. Untimeliness

Dr. McLean's Motion is first denied on the basis of being untimely. This Court filed an Amended Scheduling Order on July 6, 2010 setting forth, among other deadlines, the deadline for filing any dispositive motions. (Doc. No. 41.) This date was set for December 30, 2010. On September 27, 2010, we granted Morton's Motion to extend the deadline for production of expert witnesses, but all other deadlines, including the deadline for filing of dispositve motions remained the same. (Doc. No. 48.) On December 15, 2010, this Court also granted Dr. McLean's and other Moving Defendants' request to extend the deadline for production of defense expert reports, however, all other deadlines again remained the same. (Doc. Nos. 60-61).

5

As noted above, all other Defendants in this case filed their Motions for Summary Judgment on the deadline date of December 30, 2010. (Doc. Nos. 62-63). As noted, we filed a Memorandum and Order on February 24, 2011, granting moving Defendants' Motion for Summary Judgment in part and denying it in part. See Morton, 2011 WL 536540 at * 1. Dr. McLean filed this present Motion on May 24, 2011- almost five months after the deadline this Court set for filing any dispositive motions. In this Motion, Dr. McLean offers absolutely no explanation for the untimeliness of this filing. We, thus, deny the Motion on the basis of being untimely.

  **B. Medical Malpractice**

In addition, to denying Dr. McLean's Motion for untimeliness, we will also deny it on its merits. Dr. McLean argues that Morton has failed to produce expert testimony against him that "establishes either a deviation from the standard of care, or a causal connection between the care rendered by Dr. McLean and the injury alleged by the Plaintiff." (Def.'s Mot. Summ. J. at 1.) We disagree.

Under Pennsylvania law, to state a prima facie cause of action for a medical malpractice claim, a plaintiff must establish a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm. Hightower-Warren v. Silk, 698 A.2d 52, 54 (Pa.1997). In order to establish medical malpractice under Pennsylvania law, a plaintiff must present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from accepted medical standards, and that such deviation was the proximate cause of the harm suffered. Mitzelfelt v. Kamrin, 584 A.2d 888, 891 (Pa. 1990). The only instance in which expert testimony is not required is when the matter is so simple or the lack of

6

care so obvious as to be within the range of experience and comprehension of non-professional persons. Hightower-Warren, 698 A.2d at 54 n. 1; see also Hakeem v. Salaam, 260 Fed. Appx. 432, 434 (3d Cir. 2008).

Here, Morton presents the expert testimony of Andrew Collier, M.D. Dr. McLean argues, however, that Dr. Collier does not opine that it was a deviation from the standard of care for him not to have performed hip surgery on Morton or for him to recommend that the surgery be performed in a "university center." Rather, Dr. McLean states that Dr. Collier only opined that he didn't convey with enough urgency that Morton needed to have a follow up appointment as a soon as possible with an orthopedic physician. Dr. McLean asserts that this contention is not supported by the record in that he specifically stated in Morton's discharge summary from Frankford that Morton needed to follow up at a university center, and that the Defendant prison physicians were aware of this instruction. Morton, on the other hand, maintains that when he arrived at Frankford Hospital he had two broken hips and should have been immediately treated for them. He contends that Dr. McLean did nothing to treat him or get treatment for him, and instead, simply discharged him back to the prison to follow up at a university hospital "as needed." (Pl.'s Resp. Mot. Summ. J., Ex. K.) Morton asserts that as a consequence of Dr. McLean's inaction, he was permitted to languish for four months before his hip fractures were repaired.

In support of his position, Dr. McLean offers the following testimony from Dr. Collier:

> Basically my only fault with Dr. McLean is you sent him back to a prison ward and really didn't make all the phone calls and tell the people he was coming. It was sort of like they dropped the ball at their end. Like I said, you're sending somebody back into an institutional black hole. They go there. Paperwork doesn't travel with people. It goes with guards or sits on

7

> somebody's desk and it doesn't go anywhere it needs to go. So my only
> fault with- criticism is that one, you sent him somewhere to get it taken
> care of or pick up a phone, make a couple of calls and say guys, this, you
> know, is not dire, but it's - - it doesn't have to be done today, but it should
> be done expeditiously when somebody, you know, who's going to be
> sitting, who can't get around now who was walking before now can't
> walk, stuck in a wheelchair with two broken hips of whatever age.

(Dr. Collier Dep. at 41.)

Here, it is not disputed that Dr. McLean was one of the physicians who provided medical care to Morton at Frankford Hospital on July 2-3, 2008. As such, he owed Morton a duty of care. Dr. McLean asserts that Dr. Collier does not question his duty of care. We disagree, and find that this is a question for a jury to decide. It is apparent from the record that Dr. Collier did opine that he believed Dr. McLean's treatment and care of Morton was below the standard of care. Dr. Collier stated in his expert report that "Appropriate treatment and care would have required bilateral hip surgery to repair his known fractures. Instead, he was referred back to the prison system where he had a delay in treatment and care." (Pl.'s Resp. Mot. Summ. J., Ex. A.) In addition, Dr. Collier testified at his deposition that Dr. McLean's inaction in treating Morton violated his duty of care. He stated:

> I understand that Dr. McLean did not feel comfortable doing
> [surgery] which is fine. So at that point, you either let somebody
> else do it at the hospital. I'm sure somebody else is a hip surgeon
> at Frankford who can do this, or transfer to someone such as Dr.
> Zaratto at Penn, somewhere else that again, make the transfer to
> have this problem that was relatively acute and was not resolved at
> the time of his release. He still had pain in his hips, couldn't walk.
> It was the reason he came to the hospital.

(Dr. Collier Dep. at 37.)

Dr. McLean also argues that Dr. Collier's testimony as to the age of the fractures,

together with Morton's representation that he was able to walk several days before coming to the Frankford Hospital indicates that the fractures were chronic and not emergent.  He, thus, asserts that because it was not an emergency situation, he did not breach his duty of care by not taking measures to ensure that Morton's hip fractures were treated before he was sent back to the prison system.  (Def.'s Mot. Summ. J., at 20.)  In support of this position that Morton's fractures were not acute but chronic,  Dr. McLean offers the following deposition testimony from Dr. Collier:

> Q.  Let's back up then.  Your conclusion is this was an acute fracture?
>
> A.  I thought it was an acute or semi-acute, within a week or two, yes, sir.
>
> Q.  Well, first of all, what definition do you use as acute, a week or two?
>
> A.  Well, technically, a chronic thing would be after three months in fracture healing.  I thought this was semi-acute or within a week or two, somewhere around there, yes sir.
>
> Q.  So just [] we have our terms straight, you use acute to mean a week or two old?
>
> A.  I would say it was acute or sub-acute.  I mean, most times chronic is three months or better in very basic terms.  So, in this case, I thought it was within a week or two that he had the fracture, and again, there's reabsorption. . . .
>
> Q.  Just so I'm clear, when you use the term acute, you are saying a week or two old?
>
> A.  In this case, I was saying about a week or two, yes, sir. Thought it was two to three weeks versus chronic, which is gonna go on for technically three months or six months, depending on the definitions.

(Collier Dep. at 11-12.)  We, however, certainly cannot conclude from this testimony that  Dr.

Collier is opining that Morton's injuries did not require immediate care. As indicated, he testified that he believed the fractures to have happened "within a week or two." (Id. at 11.) Moreover, as discussed above, Dr. Collier testified that he believed Dr. McLean should have ensured that Morton received immediate treatment for his hip fractures by either referring Morton to another doctor at Frankford who performed such surgery or transferring him to a university hospital to a hip surgeon. (Id. at 37.) Accordingly, we find that the question of whether Dr. McLean breached his duty in treating Morton to be one for a jury, and this Motion is denied.

 An appropriate Order follows.